(No. 23376.—

CHARLES E. COUGHLIN *et al.* Appellees, *vs.* THE CHICAGO PARK DISTRICT *et al.*—(ROBERT J. DUNHAM *et al.* Appellants.)

*Opinion filed June 10, 1936—Rehearing denied October 7, 1936.*

JAMES M. SLATTERY, and KIRKLAND, FLEMING, GREEN & MARTIN, (JOSEPH B. FLEMING, MARTIN G. LOEFF, JOSEPH H. PLECK, and EDWARD C. CALDWELL, of counsel,) for appellants.

SAMUEL A. & LEONARD B. ETTELSON, (SAMUEL A. ETTELSON, EDWARD C. HIGGINS, and CARL J. APPELL, of counsel,) for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

The superior court of Cook county awarded a writ of *mandamus* commanding the commissioners and the general superintendent of the Chicago Park District to issue a permit for the purpose of an address by the Reverend Charles E. Coughlin at Soldier Field in Burnham Park on August 21, 1935, or on some other convenient day thereafter, weather conditions permitting, as might be fixed by the defendants and ordering that the facilities of Soldier Field, including its equipment, lighting, use of the public address system, and police protection, be given the petitioners upon the same terms and at no greater price or charge than the defendants charged and collected from other persons for the use of the field and in accordance with the usual and customary terms as provided by the ordinances,

rules and regulations of the Chicago Park District, governing the use of the field.

The trial judge certified that the validity of an ordinance was involved and that the public interest required a direct appeal to this court. Robert J. Dunham, Harry Joseph, James C. Petrillo and Stephen I. Witmanski, as commissioners of the Chicago Park District, and George T. Donoghue, its general superintendent, have prayed this appeal. Martin H. Kennelly, the remaining commissioner, was also a defendant and the Chicago Park District was dismissed as a defendant.

The second amended petition was filed by appellee, Coughlin, a resident of Michigan, and the remaining six appellees who were joined as additional petitioners. The latter six were alleged to be residents and tax-payers of the city of Chicago, the Chicago Park District and of the State of Illinois. They were also alleged to be members of the National Union for Social Justice (hereinafter referred to as the National Union) of which Coughlin was alleged to be the head and spokesman.

The allegations of this last petition were, in substance: That Soldier Field is designed for citizens to hold public meetings of a peaceable and reputable nature upon payment of a reasonable fee or for a reasonable share of the cash receipts; that it is the duty of the park commissioners to rent it to persons who furnish assurance that the attendance will be sufficiently large to warrant the expense entailed in caring for, lighting and policing Soldier Field; that it has been the consistent practice to permit its use without discrimination and regardless of political, religious or social views, by reputable people whether they were residents of Illinois or otherwise; that a large appropriation has been made for maintenance of the field, and that it is the duty of the park commissioners to obtain as much revenue as possible through renting it. Chapter I, section 14, paragraph (d) of the general ordinance of the park dis-

trict, passed October 16, 1934, providing that permits for the use of Soldier Field shall be issued by the general superintendent only upon authorization of the commissioners under terms and conditions fixed by them, is said to be unconstitutional. Because it does not prescribe any reasonable rule or standard for obtaining such permits, but purports to confer upon the park commissioners, who adopted it, arbitrary discretion as to its use, it is said to deny to citizens the equal protection of the laws and to contravene the Illinois statute which provides for the establishment and maintenance of the park as "a public park for the recreation, health and benefit of the public, and free to all persons forever." It was alleged there is no privately owned place which can accommodate a crowd of 100,000 which appellees estimated would be the probable attendance at the proposed lecture on "Social Justice." It was asserted that this address would contain nothing subversive of or inimical to the constitution, the existing principles of government, or the public peace.

On May 28, 1935, Coughlin, as spokesman for the National Union, applied to the park commissioners through Eugene J. Steiner, for permission to use Soldier Field for the purposes stated above, and offered to pay the usual and customery charge for such use of the field. Although Steiner appeared on behalf of Coughlin and the National Union before the commissioners it was claimed he was given no opportunity to be heard, and that the application for a permit was summarily refused. It was alleged that Coughlin had complied with all legal requirements for the issuance of such permit under the statutes and rules of the commissioners, and that their refusal to issue it was an abuse of their discretion.

Appellees also alleged that on June 1, 1935, Coughlin renewed his request for the field for the same purpose and that a permit was again arbitrarily refused; that the commissioners telegraphed him on this occasion that they had

unanimously resolved as a matter of policy not to permit the use of the facilities of the Chicago Park District for the dissemination of propaganda upon political and economic subjects of a controversial nature; that appellants did not know what Coughlin's proposed address would contain, but that, by innuendo, they characterized it as being of a subversive and controversial nature, and that this prejudgment of his speech and attempt to suppress the meeting violated the constitutional right of the people peaceably to assemble and petition the government for redress of grievances, and the right of free speech guaranteed by the State and Federal constitutions. On June 4, 1935, a similar request was made by Coughlin acting for the National Union, and it was alleged that it was also arbitrarily refused.

Appellees then alleged that there were 200,000 members of the National Union living in and near Chicago, who were interested in hearing the address by Coughlin, as its representative; that nothing in or about the proposed meeting would be violative of the peace or good repute of the city of Chicago, Soldier Field or of the Chicago Park District; that the National Union was not a political party in any proper sense of that term; that the proposed meeting was not intended for the advancement of partisan politics but was intended for the discussion of broad questions of social justice and that the views Coughlin expected to express were not controversial except in the sense that other persons might differ from them; that the appellants, as commissioners, were not authorized to forbid or suppress a meeting solely on the ground that political or controversial matters might be discussed and such action constituted an abuse of their discretion; that thereby the commissioners invaded the constitutional rights of free speech and peaceable assembly; that Coughlin was ready and willing to pay a reasonable compensation for the use of Soldier Field, to-wit: fifteen per cent of the gross receipts from

the sale of admission tickets to the proposed meeting for the use of the field, its equipment, lighting, the use of the public address system and for police protection; that if the court found some other rate of compensation fairer and more reasonable Coughlin was ready and willing to pay upon such basis, and that he was ready and willing and offered to comply with all reasonable rules of the Chicago Park District, and that for themselves and as representatives of the National Union, petitioners offered to coöperate with the appellants to make the meeting orderly and peaceable. In substance the petition prayed that a writ of *mandamus* issue directed to the appellants and the park district commanding them to issue a permit for use of the field as aforesaid on July 23, 1935, or on some convenient date thereafter.

The appellants' motion to strike the petition raised the following points: That the right of free speech and the right of the people peaceably to assemble and petition the government for the redress of grievances are not involved in the case; that the commissioners of the Chicago Park District have the authority and duty to regulate and control the parks within their jurisdiction; that no one has a constitutional right to use Soldier Field and its facilities for a public speech or public meeting; that a resident of the State of Michigan has no right to the park facilities of the Chicago Park District; that no facts were alleged in the petition showing a legal duty on the part of appellants to let Soldier Field to any or all of the appellees for the purposes stated; that the petition did not show whether the application was made on behalf of Coughlin or on behalf of the National Union which was not made a party to the proceeding; that the petition did not show whether the right sought to be enforced was for Coughlin or for the National Union or for the benefit of all the appellees and that the petition did not state to whom, if issued, the permit should run; that the appellees, other than Coughlin,

were improperly joined with him as petitioners because they were not shown to have any cause of action with him, since they had made no request for the use of Soldier Field; that there was no community of interest among appellees shown; that it was not shown that any of the appellees had any interest in the proceeds to be derived from such meeting; that *mandamus* will not lie to enforce the private rights of others; that the acts to be performed and the time of performance were not stated with sufficient particularity; that the terms and restrictions upon which the court as a matter of law should compel the renting or leasing of Soldier Field to appellees or any or either of them, did not appear from the petition; that it was not practicable or possible for the court to prescribe the conditions upon which Soldier Field should be let, or to specify the rent and other terms of the lease, and to order and supervise the installation of lighting and seating facilities, the care of the equipment, the policing of the field and other similar matters resting within the discretion of the appellants; that it would be necessary for the court to specify all the terms and restrictions under which a permit should issue and to order and direct the commissioners to authorize the general superintendent to issue a permit containing such terms and conditions, all of which was beyond the jurisdiction of the court in as much as it would constitute an invasion of legislative functions; that it did not appear from the petition that there was a usual and customary charge or fee for the use of Soldier Field, and the allegations that Coughlin offered to pay fifteen per cent of the gross receipts, or to pay some other sum found by the court to be more fair and reasonable, constituted a refusal by appellees to pay more than fifteen per cent; that the appellees reserved the right to pass upon the reasonableness of the rules and regulations; that it appeared from the petition that the appropriation of $200,000 for expenses in operating Soldier Field might be incurred only in stag-

ing special events and that the expenses must be paid out of the proceeds from such events and not by taxes; that it did not appear from the petition what admission fee was to be charged for the proposed lecture nor was it alleged that the share of the Chicago Park District would be sufficient to pay the expenses caused by renting the field to appellees; and that it was not alleged in the petition that political and economic subjects of a controversial nature would not be discussed.

The motion to strike was overruled and appellants answered the petition. They reserved their objections to substantive defects and set up that the act of February 24, 1869, which provides that the park property shall be held, managed and controlled by the park commissioners for the recreation, health and benefit of the people and free to all persons forever provides nevertheless, that such property shall be subject to the necessary rules and regulations "for the well ordering and government of the parks." Appellants denied that Soldier Field was designed for the holding of any kind of meeting of a peaceable or reputable nature for the physical or mental recreation or benefit of the public which any group of citizens may desire to hold there upon the payment of a reasonable fee or share of the gross receipts. They denied that it was the duty of the commissioners to obtain as much revenue or income from the field as is reasonably possible by renting it out to any reputable persons who may desire to use it for any reputable purpose and who furnish reasonable assurance that the attendance at any proposed meeting will be sufficiently large to warrant the expense of preparing, caring for, lighting and policing the field. They averred that appellees had not furnished and could not furnish reasonable assurance that the attendance at the proposed meeting would be sufficiently large to warrant such expenditures. They denied that chapter I, section 14, paragraph (d) of the park district ordinance of October 16, 1934, as amended, above re-

ferred to, is unconstitutional and void. They denied that they acted arbitrarily or summarily in refusing the permit, but averred that the application was refused after due consideration by the commissioners and in pursuance of a resolution adopted which determined the policy of the commissioners to deny the use of Soldier Field to all persons seeking to use the field for the dissemination of propaganda upon political and economic subjects of a controversial nature. They also averred that what they did was to exercise the discretion vested in them and that the action of *mandamus* cannot be brought to compel them to exercise their discretion in a particular manner. They also denied that there had been a practice by these commissioners or their predecessors, the South Park Commissioners, to permit reputable persons who were citizens of this or other States, to use the field upon payment of a reasonable or customary fee or charge therefor. They denied that such use as that sought here was ever permitted with respect to Soldier Field and aver that it is the policy of the appellants, and was of their predecessors, to deny the use of Soldier Field for any lecture on political quasi-political or economic questions. They denied that there was no other meeting place in Chicago or its vicinity with a seating capacity equal to that of Soldier Field. They also denied that the proposed meeting was a legitimate or necessary public function and that the usual and customary fee for such a meeting was fifteen per cent of the proceeds from the sale of admission tickets and averred that there was no usual or customary charge for such a meeting and that no meeting similar to that proposed was ever held in Soldier Field.

Appellants averred that the meeting, contrary to the allegations in the petition, was intended to further partisan politics in that it was intended to further and advance the politics or principles of the National Union, it being admitted in the petition that broad questions of social justice were to be discussed, a subject which in the past had in-

cluded an attack by Coughlin upon the present social and economic order, upon American statesmen, so-called industrialists, capitalists, bankers and persons engaged in large enterprises. They averred that opinions expressed on political and economic subjects in many instances had been inflammatory and had tended to promote bitter controversies and ill-feeling on questions doubtful of solution; that although the discussion of political, economic and social questions had its proper place, appellants had reached the conclusion that Soldier Field should not be used for meetings which might stir up strife and dissension to no good purpose, and they averred that no precedent should be established which would defeat this practice and policy. They averred that it was, and had been, the opinion of the commissioners that the proposed address would embrace political and economic subjects of a controversial nature, and that their opinion was based upon the nature of the subject to be discussed, "Social Justice," and upon radio addresses by Coughlin on that subject, and his addresses on that subject in Detroit, New York and Cleveland, but that the appellants did not condemn his utterances. They averred that the merits of his views were not an issue in this proceeding and that they did not express any criticism of his hypotheses, or those of the National Union. They averred that the interests of the Chicago Park District and its citizens would best be served by adherence to the policy of refusing all applications for permits to use Soldier Field for discussions of political and economic subjects. They averred that they had the duty and authority to deny the use of Soldier Field for meetings which in their judgment would be inconsistent with the purposes for which the park property and Soldier Field were established, and which they judged would be inimical to the harmony, good will and good order of the people; that after due deliberation, they had determined that the three applications should be denied for the reasons stated. They denied that these refusals

constituted a violation of the State or Federal constitutions; denied that their action was a violation of the right of the people to peaceably assemble and petition the government for redress of grievances, and that it violated the right of free speech. They denied that the membership of the National Union formed a large portion of the population in and about the city of Chicago; denied that the proposed lecture would be designed for the recreation of the people who might desire to attend it, and averred that the proposed address would not be one that would be universally regarded as being designed for the enlightenment, instruction or benefit of the audience.

There is no great difference between appellants and appellees as to the facts, except, perhaps, as to the conversation between Eugene J. Steiner and Evan I. Kelly, chief of the special service division of the Chicago Park District, and as to whether Steiner was given a full opportunity to present an argument or discussion of the request for the use of Soldier Field when he attended the meeting of the park commissioners on May 28, 1935. Three separate requests for the use of the field were made and all were denied. A resolution was adopted by a unanimous vote of the commissioners, declaring it to be the policy of the commissioners not to allow Soldier Field to be used for meetings at which political and economic subjects of a controversial nature would be discussed. After Steiner's appearance before the commissioners, one of the attorneys for appellees appeared at a later meeting and presented a request for the use of Soldier Field and was given an opportunity to be heard. Later, appellant, Robert J. Dunham, as president of the park commissioners, wrote the appellees' attorneys a letter which recited that the application had been denied, and gave substantially the same reasons for this action as those in appellants' answer.

The testimony shows that Soldier Field is a large, open air stadium, which cost $8,000,000 and was designed pri-

marily for athletic events, and that it had been rented for various events at different charges ranging from ten per cent of the gross receipts, plus expenses, to one hundred thousand dollars. The rental varied with the use, but there was no customary charge and no letting is shown for the giving of a lecture upon a political or economic subject. On two or three occasions speeches of varying lengths and on different subjects were made either during some athletic event, a reception, a labor day celebration or during the Century of Progress exposition. The expenses of preparation, lighting, erection of temporary seats, the use of the public address system, policing the field and of cleaning it after its use, are large. It is shown that in Washington Park, without the issuance of permits, individuals addressed such persons as would listen, upon all manner of subjects and that the appellants knew that this practice existed. It is also shown that by authority from the legislature part of Burnham Park was leased to the Century of Progress exposition and that during the progress of the exposition many different lectures and addresses were made in the park, some of which were made in Soldier Field. Applications for the use of the field for a "Constitution Day" celebration, for a "Columbus Day" celebration on October 12, 1934, for a meeting of the Illinois Police Association, and for a county fair were denied.

The appellants' first point is that the facts alleged do not show a clear right in any or either of the appellees to such use of Soldier Field. The act of February 24, 1869, creating the South Park Commissioners, (Private Laws of Illinois, 1869, vol. 1, p. 360,) provides that the lands and premises acquired by the commissioners "shall be held, managed and controlled by them and their successors as a public park, for the recreation, health and benefit of the public and free to all persons forever, subject to such necessary rules and regulations as shall from time to time be adopted by said commissioners and their successors, for the

well ordering and government of the same." The successor of the South Park Commissioners is the Chicago Park District and section 7 of the act creating it, approved July 10, 1933, (Ill. State Bar Stat. 1935, chap. 105, par. 574, p. 2375; 105 S. H. A. 333.7,) provides that the Chicago Park District shall be vested with all the powers heretofore vested in park districts or corporate authorities whose authorities have been abrogated by the act and that the commissioners of the Chicago Park District may "establish by ordinance" all needful rules and regulations for the government and protection of the parks, and may make and enforce reasonable traffic and other regulations. Sections 5 and 6 of the same act provide for the appointment of a general superintendent. His powers and duties are to be prescribed by the commissioners. Section 11 of the act provides that all lawful ordinances, resolutions, by-laws, orders or rules in force in any superseded park district, which are not inconsistent with the act creating the Chicago Park District, shall continue in force.

On October 16, 1934, the Chicago Park District passed an ordinance relative to the control and management of its parks. Chapter 10, section 8, of that ordinance provides that no person shall make any speech or public address or hold or participate in any public meeting, procession or parade in the park system, unless a permit therefor has first been obtained from the general superintendent, under such regulations as may be prescribed; that loud speaker or public address instruments and systems shall not be used except when authorized by such a permit so issued. The powers of the general superintendent are defined in chapter 1, section 14, of the ordinance. He may issue permits for the use of Soldier Field only upon authorization by the commissioners, under terms and restrictions fixed by them.

The appellants contend that they are not required to provide facilities for public speaking, personal publicity or to grant the use of park property to organizations or indi-

viduals for the purpose of raising revenue. They contend appellees had to show a legal right to the use demanded in order to entitle them to the writ of *mandamus*. They rely upon *Commonwealth* v. *Davis,* 162 Mass. 410, 39 N. E. 113, affirmed in *Davis* v. *Massachusetts,* 167 U. S. 43, 42 L. ed. 71; 17 Sup. Ct. 731. In that case Davis was convicted of making an address on the Boston Common, without having obtained a permit from the mayor, under an ordinance which provided: "No person shall, in or upon any of the public grounds, make any public address * * * except in accordance with a permit from the mayor." The Massachusetts court speaking through Justice Holmes said: "There is no evidence before us to show that the power of the legislature is less over the Common than its power over any other park dedicated to the use of the public, or over public streets, the legal title to which is in a city or town. (*Lincoln* v. *Boston,* 148 Mass. 578, 580, 20 N. E. 329.) As representative of the public, it may and does exercise control over the use which the public may make of such places and it may and does delegate more or less of such control to the city or town immediately concerned. For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary rights interfere, the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the less step of limiting the public use to certain purposes. See Dill. Mun. Corp. sections 393, 407, 651, 656, 666; *Commissioners* v. *Armstrong,* 45 N. Y. 234, 243, 244.

"If the legislature had power, under the constitution, to pass a law in the form of the present ordinance, there is no doubt that it could authorize the city of Boston to pass the ordinance, and it is settled by the former decision that it has done so. As matter of history, we suppose, there is

no doubt that the town, and, after it the city, always regulated the use of the Common, except so far as restrained by statute. It is settled also that the prohibition in such an ordinance, which would be binding if absolute, is not made invalid by the fact that it may be removed in a particular case by a license from a city officer, or a less numerous body than the one which enacts the prohibition.— *Com.* v. *Ellis,* 158 Mass. 555, 557, 33 N. E. 651, and cases cited."

In the decision of the *Davis case* in the United States Supreme court, after quoting the above, the court said: "It is therefore conclusively determined there was no right in the plaintiff in error to use the Common except in such mode and subject to such regulations as the legislature in its wisdom may have deemed proper to prescribe. The fourteenth amendment to the constitution of the United States does not destroy the power of the States to enact police regulations as to the subjects within their control, (*Barbier* v. *Connolly,* 113 U. S. 27; *Minneapolis and St. Louis Railway Co.* v. *Beckwith,* 139 U. S. 26, 29; *Giozza* v. *Tiernan,* 148 U. S. 657; *Jones* v. *Brim,* 165 U. S. 180,) and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the constitution and laws of the State.

"The assertion that although it be conceded that the power existed in the State or municipality to absolutely control the use of the Common, the particular ordinance in question is nevertheless void because arbitrary and unreasonable in that it vests in the mayor the power to determine when he will grant a permit, in truth, whilst admitting on the one hand the power to control, on the other denies its existence. The right to absolutely exclude all right to use necessarily includes the authority to determine under what circumstances such use may be availed of, as the greater power contains the lessor. The finding of the court of last resort of the State of Massachusetts being

that no particular right was possessed by the plaintiff in error to the use of the Common, is in reason, therefore, conclusive of the controversy which the record presents, entirely aside from the fact that the power conferred upon the chief executive officer of the city of Boston by the ordinance in question may be fairly claimed to be a mere administrative function vested in the mayor in order to effectuate the purpose for which the Common was maintained and by which its use was regulated. (*Ex parte Kollock,* 165 U. S. 526, 536, 537.) The plaintiff in error can not avail himself of the right granted by the State and yet obtain exemption from the lawful regulations to which this right on his part was subjected by law."

In *Commonwealth* v. *Abrahams,* 156 Mass. 57, 30 N. E. 79, Abrahams was fined for delivering an oration in Franklin Park, in violation of the rules of the park commissioners. The court said in affirming his conviction: "The defendant admits that the people would not have the right to assemble for the purposes specified, in the public streets and might not have such a right in the public garden or on the Common, because such an assembly would or might be inconsistent with the public uses for which these places are held. The same reasons apply to any particular park. The parks of Boston are designed for the use of the public generally; and whether the use of any park or a part of any park can be temporarily set aside for the use of any portion of the public is for the park commissioners to decide, in the exercise of a wise discretion."

In *Love* v. *Phalen,* 128 Mich. 545, Love brought an action of *mandamus* to compel the judge of the Recorder's court to entertain a prosecution against a man named Allen for violating an ordinance which forbade the making of any public address in any public place within a half-mile of the city hall in Detroit without first obtaining the permission of the mayor. The writ was granted and the prosecution was directed to proceed over the objection that the

ordinance was invalid. The Michigan Supreme court said: "The question in this case is, who may occupy the public spaces in the city,—some individual who happens to get there first, or shall all the citizens of Detroit have equal rights there? and what shall be the manner of the occupancy? It is evident that no considerable portion of the citizens of a great city like Detroit could occupy this limited space at one time, nor could all of the preachers, teachers, and public speakers in that city who might think they had a message to deliver to the people, with the audiences they would naturally draw, find room at one time in this public space, without rendering it useless as a place across which the public might travel. Under such circumstances, what can be more reasonable than to lodge the power of deciding when and where one may occupy this public space in one having sufficient intelligence and so possessing the confidence of his fellow citizens that they have placed him at the head of the municipal government? * * *

"It is said the ordinance is directed against freedom of speech, but this is a mistake. It is simply directed to the method of using a public space, and is no more a curtailment of the right of free speech than would be an ordinance that prohibited the making of public addresses in the corridors of the city hall." .

In *Fitts* v. *City of Atlanta,* 121 Ga. 567, 49 S. E. 793, the defendant was convicted of violating a city ordinance which declared it to be unlawful to hold public meetings in the city streets without the consent of the municipal authorities. The court said: "Neither the prohibition placed on Congress by the first amendment of the constitution of the United States, whereby it was declared that 'Congress shall make no law abridging the freedom of speech,' nor the provision of the constitution of this State which declares that no law shall be passed curtailing or restraining the liberty of speech, confers any constitutional right to gather crowds and make public orations in the streets of

a city regardless of the municipal control over them." See also *Harwood* v. *Trembley,* 97 N. J. Law, 173, and 12 Corpus Juris, p. 954.

No authorities from our own State are cited on the point, but we are convinced of the soundness of the views expressed in the above mentioned decisions to the effect that no citizen has a right to use at his pleasure or on his own terms, public property belonging to and under the control of a municipality, without a permit from a designated officer of such municipality or its executive officers. The appellees admit the validity of the regulations of the park commissioners prohibiting the use of field houses in the various parks of the Chicago Park District for political and religious gatherings. They do not admit the authority for or validity of a regulation prohibiting the use of Soldier Field for the use of an individual or organization for the purpose of making a public address on a social, political or economic subject. This whole set of contentions is based upon the claim that there is a constitutional and a primary or inalienable right in the appellees to use Soldier Field for public addresses on those subjects, regardless of the municipality's right to control, manage and regulate this park facility, with the parks generally, for the best interests of the public. No such right exists in any member of the public. The legislature by the acts of 1869 and 1933, gave the power of regulation to the appellant commissioners.

Excepting Coughlin, no appellee had any connection with the demands for the use of Soldier Field. They do not allege that they made such demand and the proof is that they did not. They claim to sue for themselves and all other members of the National Union for Social Justice, whose situation and interest are similar to theirs—in other words, to sue in a representative capacity. A demand and refusal were prerequisite to entitle them to sue. (*Murphy* v. *City of Park Ridge,* 298 Ill. 66.) In 38 Cor-

pus Juris, p. 834, the rule is laid down that one person cannot by *mandamus* enforce the private rights of another. These appellees were improperly joined as petitioners.

Appellants are also correct in their contention that the only party which made a demand for the use of Soldier Field has not joined in the petition. The applications presented by Eugene J. Steiner, Charles E. Coughlin and Samuel A. Ettelson were made on behalf of the National Union for Social Justice, a Michigan corporation. It is true that Coughlin is mentioned as the head of that organization and its spokesman and that the proposed address was to be delivered by him. There is no proof that he offered at any time to become personally responsible to appellants for the charge for the use of Soldier Field, other than as representative of the organization. The fact that in their communications with each other, the appellants and their employees referred to the matter as a request for the use of the field by him does not supply proof of a demand by him or an offer by him to be responsible for such charge, or estop the appellants.

We do not deem it necessary to discuss appellants' contention that the National Union is a Michigan corporation and that Coughlin is a resident of Michigan, and that neither of them, for this reason, has any right to the use of the Park District's property. Neither do we consider it necessary to pass upon the admissibility in evidence of the fact that there was a conversation between appellants, Dunham and Donoghue, as to the former policy with reference to the use of Soldier Field and that the latter told the former that it had been the practice not to permit its use and the use of the halls in the parks for such meetings as that proposed by appellees.

A writ of *mandamus* will not be awarded in a doubtful case but will issue only when a clear and undeniable right is shown to exist. The parties sought to be coerced must be bound to act and it was incumbent upon the appellees to

show every material fact necessary to their right and that there was a duty owing to them or some one of them. *People* v. *Ames,* 360 Ill. 31, 35; *People* v. *Whealan,* 356 id. 328, 334.

We cannot agree with appellees that the appellants had no discretion to grant or refuse the use of Soldier Field. The statutes clearly indicate that the commissioners were to regulate the use of the parks. The act of 1869 and that of 1933 did not make it a mandatory duty to embody the rules and regulations in an ordinance, and by the 1933 act the earlier rules, regulations, ordinances and resolutions which were not repugnant to it, were preserved and continued in force. Whether it would be better to use the authority given and permitted by the language of the section quoted from the 1933 act which said that the commissioners "may" by ordinance establish such rules, is not the question before us. The power to regulate was in the appellants and on three occasions, once by the adoption of a resolution, they exercised such power. The resolution was sufficient so far as the particular demand was concerned.

Appellees contend that this action was arbitrary and unreasonable. The proof shows that various other requests for the use of Soldier Field had been refused for different reasons. There was no customary use proved similar to that demanded here. The commissioners are not shown to have acted in haste, through caprice, prejudice, or in total disregard of the person or persons requesting the use of this facility. Soldier Field is clearly not designed primarily for use as an open air forum but on the other hand it is primarily an athletic stadium. No fixed or customary and usual charge for its use is shown. There is nothing in the record to indicate that the fifteen per cent would reimburse the appellants for the expenses incident to the use of this facility. In *MacGregor* v. *Miller,* 324 Ill. 113, 118, we said: "It is a well recognized rule that where the performance of an official duty or act involves the exercise of

judgment or discretion the officer cannot ordinarily be controlled with respect to the particular action he will take in the matter, and where an officer, in the exercise of a discretionary power, has considered and determined what his course of action is to be he has exercised his discretion, and his action is not subject to review or control by *mandamus;* and so careful are the courts of encroaching in any manner upon the discretionary powers of public officials, that if any reasonable doubt exists as to the question of discretion or want of discretion they will hesitate to interfere, preferring rather to extend the benefit of the doubt in favor of the officer."

When a statute vests discretion in a municipal body to determine any matter or thing, it is not the province of courts to control the exercise of that discretion. (*Johnson* v. *Sanitary District of Chicago,* 163 Ill. 285.) *Mandamus* actions do not create duties or confer power to perform them. *Mandamus* is designed to compel action along lines marked out by the law and on behalf of the person seeking its aid and against the person whose duty the law has declared. If the officer has a discretion *mandamus* will not issue to control his action. It may be issued to compel the exercise of discretion but not the manner of its exercise. Officers cannot be controlled in their judgment or compelled to exercise their discretion in a particular manner by the writ of *mandamus.* (*People* v. *Webb,* 256 Ill. 364, 373.) The judgment order of the superior court of Cook county directed that a permit issue. This amounted to the control of the discretion vested in the commissioners and was erroneous.

Appellees say that in so far as the ordinance of the park district directed that the commissioners should retain control over Soldier Field and permits for its use, it is void and unconstitutional. Under the statutes the commissioners were given authority, as we have pointed out, to make regulations and rules governing the use of parks and their

facilities. No specific rule, excepting the resolution adopted when one of the demands for the use of Soldier Field was denied, and which said that it was declared to be the policy of the commissioners and the park district not to permit the use of Soldier Field for meetings where public addresses on political and economic questions of a controversial nature were to be made, is shown to have existed. Whether a *mandamus* action would lie to compel the adoption of rules is not a question now before us. In the making of the rules the commissioners would have a discretionary power. Without rules they still had discretion to grant or refuse the use of Soldier Field so long as they were not arbitrary or capricious in their action. This authority came from the legislature and not from the ordinance. For this reason we do not pass upon the validity of chapter I, section 14, paragraph (*d*) of the ordinance since it does not affect appellees.

We have already held that the rights of peaceable assembly and of freedom of speech are not infringed by the refusal of a permit to an applicant for the use of a park facility. Appellees failed to allege facts in their second amended petition which would entitle them to a writ of *mandamus,* and where substantial defects exist in a petition for *mandamus,* pleading over after a demurrer has been overruled, does not waive the points raised by the demurrer. *People* v. *Downers Grove Sanitary District,* 359 Ill. 601, 606.

Appellants' motion to strike should have been sustained, and the judgment of the superior court of Cook county is therefore reversed.                          *Judgment reversed.*