Harry M. Jobson, George B. Lemon, W. S. Patterson and R. M. Stines, Plaintiffs-Appellees, v. Northfield Township High School, District Number 225, County of Cook and State of Illinois et al., Defendants-Appellants, and Martin H. Landwehr, Wilma M. Maxson and Wayman C. Luster, Intervenor-Defendants-Appellants, Remich McDowell et al., Intervenor-Defendants-Appellees.

Gen. No. 45,655.

Opinion filed January 18, 1952. Rehearing denied February 4, 1952. Released for publication February 5, 1952.

HERLDON H. BOWEN, EDWARD W. BARRETT, and FRED WEISZMANN, all of Chicago, for certain appellants; EDWARD W. BARRETT, of Chicago, of counsel, and ZIMMERMAN & NORMAN, of Chicago, for certain other appellants; HAROLD W. NORMAN, and WILLIAM R. ENGELHARDT, both of Chicago, of counsel.

TENNY, SHERMAN, ROGERS & GUTHRIE, of Chicago, for appellees; GREGGAR P. SLETTELAND, S. ASHLEY GUTHRIE, and L. DOW NICHOL, JR., all of Chicago, of counsel.

MR. JUSTICE ROBSON delivered the opinion of the court.

This is an appeal from a decree rendered by the circuit court of Cook county upon findings in a class suit for a declaratory judgment and other relief.

The plaintiffs (appellees) are representative taxpayers and voters of the Northfield Township High School District No. 225 of Cook county. The defendants (appellants) are the District, its Board of Education and its Secretary. The Board of Education is herein referred to as Defendant-Board.

The case presents a controversy over the selection of a school site and the construction of a building thereon in the District. Two sites had been approved by the voters at separate elections. The site first approved, hereinafter referred to as the June site, and the second as the Oldfield site. Plaintiffs seek to require the Defendant-Board to build its first high school on the June site. Intervenor-defendants (appellants) are representative voters and taxpayers who seek to require Defendant-Board to build its first high school on the Oldfield site.

The case was tried in the first instance on a stipulation of facts. After the trial court rendered an opinion favoring the June site, a supplementary answer was filed by the Defendant-Board and testimony was introduced in support thereof to the effect that not all of that site could be voluntarily acquired for $125,000, the price specified on the ballot at the election at which the June site was approved.

The facts of the case were stipulated to by the respective parties and are substantially as follows: The Northfield Township High School District No. 225 was organized April 12, 1947. It was the subject of litigation which was terminated by the decision in *People ex rel. Boyington et al. v. Northfield Township High*

441

*School District No. 225*, 402 Ill. 435. **Prior to May 25,** 1949, the then members of Defendant-Board conducted a study of school sites, which included the cost of land and development thereof, operating costs, availability to sewer and water facilities, availability to transportation facilities and proximity to the majority of the school population. A Citizens' Advisory Committee, consisting of delegates representing various organizations in the community, cooperated with the defendants in holding meetings for the purpose of deciding upon a location for the high school. As a result of this investigation and of these meetings Defendant-Board on May 25, 1949, adopted a resolution calling an election to be held in the District on June 18, 1949, for the purpose of submitting to the voters of the District a site located at the northwest corner of Sunset Ridge road and Lake avenue, hereinafter referred to as the June site for the proposed new high school. The estimated cost of purchasing this site was $125,000, which the resolution proposed be financed by a bond issue for such amount.

On June 18 an election was held at which the June site was submitted to the voters for their approval. This site was the only site described on the ballot as submitted but the ballot contained an appropriate blank space for the voter to write in any other description as required by statute. The June site failed to receive a majority of those voting at the election but carried over write-ins by 339 to 19. At the same election, the voters approved by a vote of 376 to 363 a proposition that the Board of Education be authorized to purchase a schoolhouse site for the District. At the same election the voters by a vote of 373 to 367 voted against a proposition authorizing the Board of Education to issue bonds of the school district in the amount of $125,000 to purchase a schoolhouse site.

A second election was held in the District on July 16, 1949, at which the voters by a vote of 913 to 741

voted against authorizing the Board of Education to issue bonds in the amount of $125,000 to purchase a schoolhouse site. Prior to this election, individual defendants announced that any such second rejection of this bond issue would be interpreted by Defendant-Board as a repudiation by the voters of the June site.

After the July election defendants retained certain educational experts and engineers to study the comparative desirability of some fifteen proposed locations for the high school, including the June site. These experts made a report and recommended a 40-acre portion of the June site as the best available schoolhouse location in the District on the basis of initial costs of land, of sewage and water facilities, debt service, pupil transportation costs and other factors which it is not necessary to mention in detail. The experts also approved two other sites; one of which rated third in their choice, was a 70-acre tract known as the Oldfield site.

On October 13, 1949, pursuant to the necessary petitions, the Defendant-Board called an election to be held on October 29, 1949, according to a resolution which stated that it was necessary for the District to provide a high school for the education of children in said District; that the District was paying tuition to other school districts and had been renting quarters in the district which were not adequate to provide for the students; that it was estimated that the cost of purchasing a site would be $80,000 and the estimated cost of erecting a schoolhouse would be $1,670,000, or a total of $1,750,000; and that the necessary petitions had been filed for the purpose of submitting five sites at an election to be called by the Board. Pursuant to the resolution a notice of election was given and a ballot submitted to the voters at the election for voting on the following propositions: (1) To select a schoolhouse site. (Five sites were submitted, one of which was a 40-acre portion of the June site and another the

70-acre Oldfield site.) (2) To purchase a schoolhouse site. (3) To build a schoolhouse. (4) To issue bonds in the total sum of $1,750,000 for the following purposes: (a) For the purchase of a schoolhouse site at $80,000; (b) for building the schoolhouse on the site selected and purchased for said high school district $1,670,000.

At the election the 40-acre portion of the June site received the largest number of votes—1,269, and the 70-acre Oldfield site received the second largest number of votes—1,159, but neither received a majority of all votes cast on the proposition. The remaining propositions were all approved by the voters.

On November 19, 1949, a supplementary election was held requiring a choice between the portion of the June site voted on at the October 29, 1949, election and the Oldfield site. At this election a majority of those voting on the proposition voted in favor of the Oldfield site, 1,552 to 1,216. Subsequent to the November 19, 1949 election, the Defendant-Board purchased the Oldfield site for $52,500 using general funds of the school district. When plaintiffs filed their complaint on August 17, 1950, the Defendant-Board was preparing to construct a schoolhouse on the Oldfield site.

From the time of the election in June of 1949, defendants had an option to purchase the entire June site at a price of $1,900 per acre, which option has never been exercised and expired on January 15, 1950. Defendants have never purchased nor made any effort to purchase any portion of the June site. Neither have defendants at any time since the June 1949, election instituted any proceedings for the declared purpose of abandoning said schoolhouse site or changing or moving said schoolhouse site. None of the bonds authorized at the October 1949, election has been issued.

Subsequent to the original hearing and after the rendering of an opinion by the trial court, evidence was introduced to the effect that it was impossible to acquire the entire June site for the price mentioned in

444

the ballot of $125,000, but that 51 acres of that site could be acquired for that price. The testimony established that in June of 1951 it would have cost $173,000 to acquire the June site by voluntary purchase.

After the submission of the stipulation of facts and the additional testimony the court entered a decree finding that the June site comprising 59 acres had been selected by the voters to be purchased for $125,000 and thereby became and remained the one and only lawful schoolhouse site of the district; that the present owner would no longer sell said 59 acres for said sum but that 51 acres could be acquired without condemnation for not more than said sum; that the 51 acres was substantially the same site as the June site and that the Defendant-Board was ordered to acquire a 51-acre portion of said site by condemnation or otherwise. The court further found that the elections held in October and November of 1949, insofar as they authorized the selection of an additional school site, were illegal and void, and that insofar as the October election authorizing the purchase of a school site and the borrowing of $1,750,000 for the purchase of a school site and the construction of a school building, must be held as referring to the June site; that of said $1,750,000 for which the Board was authorized to issue bonds, the Board was directed to expend not more than $80,000 for the purchase of that portion of the June site provided for in the decree and the balance in the construction of a schoolhouse on that site. In the event more than $80,000 was required to purchase the decree site, Defendant-Board was ordered to make available from any lawful source an amount not in excess of $45,000. The decree further provided that in the event more than $125,000 was required for the purchase of the decree site, nothing in the decree restrained the Defendant-Board from conducting an appropriate election for the purpose of obtaining whatever larger amount might ultimately be required for the purchase

445

of the June site. The decree authorized and directed the Board to construct the first schoolhouse for the District upon the June site as soon as practicable and to use the balance of the proceeds of the bond issue of $1,670,000 for that purpose. It enjoined the erection of a schoolhouse on any other site or purchase of any other site unless and until an adequate schoolhouse was first erected on the June site. The cost of the proceedings was assessed against the defendants. Numerous points are raised by the Intervenor-Defendants and the Defendant-Board for reversal of the decree of the trial court.

The principal issue to decide is whether the School Board had the discretionary power to choose between the June site and the Oldfield site. This requires an interpretation of certain sections of the School Code. The Board of Education of the high school district in question derived its authority from article 10 of the School Code (chap. 122, Ill. Rev. Stat. 1949). The sections applicable provide in part as follows (sec. 10–5 [Jones Ill. Stats. Ann. 123.870]):

"The Board of Education shall establish at a site or sites lawfully selected one or more high schools."

Section 10–37 [Jones Ill. Stats. Ann. 123.902]:

"The Board of Education . . . may build or acquire and maintain one or more sites and erect buildings thereon when in its judgment such additional facilities are needed and the sites therefor have been lawfully selected."

The site selection under section 10–37 is controlled by section 7–10 [Jones Ill. Stats. Ann. 123.840] of the School Code, which provides in part as follows:

"To buy or lease one or more sites for schoolhouses with necessary ground and to purchase, build or move a schoolhouse, but shall not purchase or locate a schoolhouse site . . . unless authorized by a majority of all votes cast on the proposition at an election called

for such purpose in pursuance of a petition signed either by not fewer than 300 legal voters of the district . . . ."

To properly analyze these provisions we must consider their background. When the state was largely rural, schools were governed by directors whose powers were very limited and prescribed. (Ill. Rev. Stat. 1845, chap. 98, sec. 60, p. 50.) With the increase in density of population of certain districts, a gradual evolution took place resulting in the following types of school districts and governing officers:

1. Small school districts with populations of less than 1,000, governed by three school directors.

2. Larger districts with populations in excess of 1,000, whether grade or high school districts, governed by a Board of Education.

3. Township High School Districts governed by a Board of Education.

██ ██ In 1919 the high schools were governed by Boards of Education with the same powers as Boards of Education elected under the general school laws instead of the restricted powers of school directors. The legislature in this year amended the Act and authorized the township high school districts to acquire "a site or sites" for "one or more high schools" rather than the limitation of "a schoolhouse site." To carry out this objective secs. 86, 91 and 127 of the provisions relating to township high schools were amended. Session Laws, 1919, pp. 924, 925 and 926. Their counterparts in the codified School Code of 1945 are substantially the same. These related sections of the statute must be construed together. With this review of the evolution of school legislation, it is very apparent that the legislature in 1919 intended by its amendments to authorize several high school sites rather than one as had been previously provided.

■ The language is plain. The courts have not interpreted it but we are of the opinion that the legislature gave the Defendant-Board the right to elect which site or sites, when more than one had been approved, they would purchase for the purpose of erecting a high school building. To hold otherwise would put the Board at a great disadvantage in negotiating and concluding the purchase of any site. The owner would know that his was the only site which the Board had authority to purchase. In this case it would require the Defendant-Board to pay $173,000 for the June site that originally could have been purchased for $125,000, instead of having the right to choose between the June and the Oldfield sites, and after careful consideration of all factors involved, purchase the site that was advantageous to the residents of the district. Furthermore, if the legislature desired to restrict the Defendant-Board they would have placed the same limitations which are placed on school districts from one to one-thousand inhabitants. There it provides in sections 6–24 as follows:

"To purchase or locate a schoolhouse site, or purchase, build or move a schoolhouse upon the approval of a majority of the voters voting upon the proposition at an election called and conducted as required by Section 19–4. If no locality receives a majority of the votes, the directors may select a suitable site. The site selected by either method shall be the school site for the district."

Plaintiffs cite the cases of *Kiehna v. Mansker,* 178 Ill. 15, and *School Directors v. Wright,* 43 Ill. App. 270. These cases are no help in interpreting the present statutes. They were decided prior to the present statutes and involved the powers of school directors, not boards of education.

■ The next point that we are called upon to decide is whether the Oldfield site was lawfully selected

448

by the voters of the District. An examination of the aforementioned facts pertaining to the October election and November supplementary election, reveals that they were properly called and held pursuant to statute. The same procedure was followed as in the June election. It is evident that it was the intent of the ballot for the October election to relate the purchase of the school site, the construction of the building and the issuance of bonds, to a site to be selected at that election and purchased thereafter. The resolution calling the October election recites that one site had been selected and "its purchase authorized but this Board of Education believes it to the best interests of the School District that a new election be called to submit a number of different sites for a choice to be made by the voters of this District." It then recites and finds that the maximum cost of purchasing a schoolhouse site will be $80,000. It would be a strained construction to read the ballot, as plaintiff contends, as referring to a site "previously selected and to be purchased hereafter." If that were the intent, there would have been no reason for including the proposition "to purchase a schoolhouse site" on the ballot. The Board and the voters knew that it had authority to buy the June site. They also knew that the June site would cost at least $125,000, not $80,000.

The Oldfield site therefore became a lawfully selected schoolhouse site along with the June site which had been previously selected by the voters. The voters had designated two sites. The vote was an authorization under which the Board could determine which site in their opinion would best serve the needs of the District. This right must necessarily be vested in the Board and such discretionary powers should not be interfered with by the courts unless fraud, corruption, oppression or gross injustice is shown. *Coughlin v. Chicago Park District,* 364 Ill. 90, 110. We find no such

basis for interposing the court's judgment over the discretionary power of the Defendant-Board.

██ Plaintiff contends that the Defendant-Board abused its discretion in purchasing and preparing to build on the Oldfield site, and relies upon the preference of the experts for the June site and calculations of acquisition, construction and operating costs. The Oldfield site was also recommended by the experts as a satisfactory school site. The Defendant-Board was not required to delegate its responsibility to the experts. It and not the experts was responsible to the citizens of the township, the same citizens who by their vote had twice refused to authorize bonds to purchase the June site, had filed petitions to consider five other sites, and by their vote expressed a preference for the Oldfield site over 40 acres of the June site. Plaintiffs would have the court lightly pass over these factors and ask it to interpret the acts of the voters as carrying no weight with the Defendant-Board. This we cannot do.

We are of the opinion that Defendant-Board did not abuse its discretion in interpreting the acts of the voters as indicating their preference to purchase and build on the Oldfield site.

The decree of the trial court is reversed and the cause is remanded with directions to dismiss the complaint for want of equity.

*Decree reversed and cause remanded with directions.*

TUOHY, P. J. and SCHWARTZ, J., concur.