2026 IL App (4th) 250873

NOS. 4-25-0873, 4-25-0880 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| TATE ROAD SOLAR 1, LLC, a Delaware Limited Liability Company; and MYERS FAMILY FARMS LP, an Illinois Limited Partnership, | ) ) ) ) | Appeal from the Circuit Court of Winnebago County |
| Plaintiffs-Appellants, | ) | Nos.    25MR30 |
| v. | ) | 25MR57 |
| THE COUNTY OF WINNEBAGO, ILLINOIS, a Body Politic, | ) ) | |
| Defendant-Appellee. | ) ) | |
| ───────────────────────────────── | ) ) | |
| NORTH SPRINGFIELD SOLAR, LLC, a Delaware Limited Liability Company, | ) ) ) | |
| Plaintiff-Appellant, | ) | |
| v. | ) | |
| THE COUNTY OF WINNEBAGO, ILLINOIS, a Body Politic, | ) ) | Honorable |
| Defendant-Appellee. | ) ) | Ronald A. Barch, Judge Presiding. |
| | ) | |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justice Vancil concurred in the judgment and opinion.
Justice Lannerd specially concurred, with opinion.

**OPINION**

¶ 1        Plaintiffs, Tate Road Solar 1, LLC, and Myers Family Farms LP (collectively Tate

Road Solar), and plaintiff, North Springfield Solar, LLC (North Springfield Solar) (collectively

plaintiffs), submitted separate applications to defendant, Winnebago County (County), for siting

approval to develop two commercial solar energy facilities. The County denied the applications,

and in parallel proceedings, plaintiffs filed suit in the trial court seeking relief through either *mandamus* or declaratory judgments. They specifically sought orders mandating the County to approve the applications and issue all necessary permits. The County filed motions to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2024)). The court granted the motions, and plaintiffs appealed. In January 2026, plaintiffs moved to consolidate their cases into this one appeal, and we granted the motion.

¶ 2        The parties' appellate briefing broaches various topics, including Illinois's energy policies, home rule versus nonhome rule counties, local zoning power, and statutory construction. As a result of how the parties framed the litigation in the trial court, the appeal ultimately presents the question of whether, based on the complaints' allegations, *mandamus* is an appropriate remedy for plaintiffs' alleged grievances. To a limited degree, answering the *mandamus* question involves addressing the meaning and scope of section 5-12020 of the Counties Code (55 ILCS 5/5-12020 (West 2024)), as amended by Public Act 102-1123 (eff. Jan. 27, 2023), which is commonly known as the 2023 Statewide Siting Act (Act). The parties debate whether counties may enact standards that include factors beyond those specified in section 5-12020 when regulating commercial solar energy facilities. Given plaintiffs' *mandamus* cause of action, the narrower question within this debate is whether the amendment affords counties any discretion in deciding whether to approve applications for siting approval or special use permits for these facilities. We hold section 5-12020's plain language allows counties to codify and consider factors not expressly enumerated in the section and that give them some discretion when approving or denying applications. Accordingly, the trial court properly dismissed plaintiffs' complaints because *mandamus* is not an appropriate remedy.

¶ 3                                  I. BACKGROUND

¶ 4                                   A. Tate Road Solar Project

¶ 5            On September 18, 2024, Tate Road Solar submitted an application to the County for siting approval to develop a 4.99-megawatt commercial solar energy facility on 75.30 acres in the County. The application contained all the information required by the applicable governing laws, namely section 5-12020 of the Counties Code and section 17.3 of the Winnebago County Unified Development Ordinance (UDO) (Winnebago County Code of Ordinances § 90-17.3 (adopted July 25, 2024)). The Winnebago County Zoning Board of Appeals (ZBA) considered the application in a public hearing on October 9, 2024. Two project developers and an attorney testified for Tate Road Solar. The ZBA and the public cross-examined the witnesses. The ZBA then heard public comment. The ZBA voted 5 to 1 to recommend the Winnebago County Board (County Board) deny the application. The ZBA members who voted to recommend denial said they did so because the application did not satisfy the standards contained in section 17.3(A) of the UDO. A few weeks later, the County Board's zoning committee likewise recommended the County Board deny the application by a 4 to 1 vote. The County Board held a meeting on November 14, 2024, during which it heard public comment and discussed the application. The County Board did not approve an ordinance granting site approval for a commercial solar energy facility, effectively denying plaintiff's application. The County Board did not issue a written order listing any factual findings or explaining its rationale.

¶ 6            Tate Road Solar filed a two-count complaint in the trial court on January 23, 2025. Count I sought *mandamus* relief pursuant to article XIV of the Code (735 ILCS 5/art. XIV (West 2024)), alleging its application for siting approval "complied with all the requirements of the *** Act and all provisions of the UDO consistent with and authorized under the *** Act." The complaint alleged Tate Road Solar had a clear legal right to have its application approved under

section 5-12020(g) of the Counties Code (55 ILCS 5/5-12020(g) (West 2024)), and the County had a clear duty to approve the application. Tate Road Solar sought an order mandating the County to immediately approve the application, permit siting approval, and provide all necessary permits for the solar project. Count II sought declaratory judgment under section 2-701 of the Code (735 ILCS 5/2-701 (West 2024)), repeating many of count I's allegations. Count II alleged an actual controversy existed between Tate Road Solar and Winnebago County, "as the County has wrongfully denied the [a]pplication." Count II sought nearly identical relief, except it requested a declaration that its application be approved and issued site approval.

¶ 7    On February 28, 2025, the County filed a motion to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2024)), claiming section 5-12020 "does not give Plaintiffs an absolute right to a permit." Following the May hearing, the trial court issued an order on July 9, 2025, which granted the County's motion, dismissed count I with prejudice, and dismissed count II with leave to replead.

¶ 8    On count I, the trial court determined *mandamus* relief was "not available" in this case because section 5-12020 "does not contain language which confers an unequivocal right to the relief requested" nor does it "set forth an unequivocal duty on the part of the County Board to act in the manner requested by" Tate Road Solar. Put simply, the court found section 5-12020 allowed the County to exercise discretion when deciding whether to grant or deny siting approval or special use permits for commercial solar energy facilities.

¶ 9    On count II, the trial court found the complaint "sufficiently allege[d] the components of a claim seeking declaratory relief." However, the complaint failed to reference or acknowledge the application of section 5-12012.1 of the Counties Code (55 ILCS 5/5-12012.1 (West 2024)), which "limits the scope of a trial court's review of a county board's decision to grant

or deny a special use permit application." The court afforded Tate Road Solar leave to replead. Instead, Tate Road Solar appealed the court's judgment.

¶ 10                    B. North Springfield Solar Project

¶ 11        On July 24, 2024, North Springfield Solar submitted an application for siting approval to develop a 4.5-megawatt commercial solar energy facility on 71.09 acres located in unincorporated Winnebago County along North Springfield Avenue. North Springfield Solar later submitted supplemental materials for the application. The final application contained all the information required by section 5-12020 of the Counties Code and the UDO. The ZBA held a public hearing for the application on December 10, 2024. The project developers, an attorney, and the landowner testified in support of North Springfield Solar's application. The public and the ZBA cross-examined the witnesses. The ZBA also heard public comment, and public opinion was universally opposed to the application. The ZBA unanimously voted to recommend the County Board deny the application. According to the ZBA members, the following reasons motivated their "no" vote: the land evaluation and site assessment's high score, location near an airport and potential glare, runoff and drainage issues, and proximity to a residential subdivision. The County Board's zoning committee likewise voted unanimously to recommend denying North Springfield Solar's application. The County Board denied the application by a unanimous vote on January 9, 2025. North Springfield Solar filed suit on February 12, 2025. Its two-count complaint largely mirrored Tate Road Solar's complaint and sought the same relief, namely *mandamus* or declaratory judgment.

¶ 12        On April 30, 2025, the County, pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2024)) and for the same reasons as in the other case, moved to dismiss the complaint. During a hearing on August 14, 2025, counsel for the parties informed the trial court

"the arguments would be virtually the same as in the Tate Road Solar case." The court confirmed there would be "no difference between the arguments, the legal cases cited, the statutes cited." It noted there were differences between the two cases, particularly different locations or interests, but the issue of *mandamus* remained the same. The court ruled "the motion to dismiss would be granted pursuant to the reasoning in the decision in case 2025-MR-30, specific to the *mandamus* case. The second count's then dismiss [*sic*] with the opportunity to replead." When North Springfield Solar's counsel indicated "no intention to replead," the court dismissed count II, as well. It then entered the attendant order. North Springfield Solar appealed.

¶ 13        As we noted *supra* ¶ 1, upon plaintiffs' motion, we consolidated case Nos. 4-25-0873 and 4-25-0880 into this one appeal.

¶ 14                                II. ANALYSIS

¶ 15                                A. The Framework

¶ 16                        1. *Section 2-615 Motion to Dismiss*

¶ 17        Plaintiffs argue their complaints properly pled claims for *mandamus* and declaratory judgment and should have survived the County's section 2-615 motion to dismiss. "A section 2-615 motion attacks the legal sufficiency of the complaint." *Howard v. Weitekamp*, 2015 IL App (4th) 150037, ¶ 12. This motion raises the question of whether the complaint's allegations, when viewed in the light most favorable to the plaintiff, sufficiently state a cause of action on which relief can be granted. *Cebertowicz v. Madigan*, 2016 IL App (4th) 140917, ¶ 14. "In ruling on a section 2-615 motion, the court only considers (1) those facts apparent from the face of the pleadings, (2) matters subject to judicial notice, and (3) judicial admissions in the record." (Internal quotation marks omitted.) *Howard*, 2015 IL App (4th) 150037, ¶ 12. We review *de novo* a trial court's ruling on a section 2-615 motion to dismiss. *Cebertowicz*, 2016 IL App (4th) 140917, ¶ 14.

We can affirm the court's judgment on any basis supported by the record. *Howard*, 2015 IL App (4th) 150037, ¶ 12.

¶ 18                                    2. *The Relief Sought*

¶ 19        Plaintiffs' complaints sought either *mandamus* relief or declaratory judgment. They linked their claims, alleging the same facts for both and tying both to section 5-12020(g) of the Counties Code. Plaintiffs' counsel acknowledged this during oral argument, conceding that if *mandamus* is not appropriate, then neither is declaratory judgment.

¶ 20                                    a. *Mandamus*

¶ 21        "*Mandamus* is an *extraordinary* remedy compelling a public official to perform a *purely* ministerial act ***." (Emphases added.) *Oliver v. Kuriakos-Ciesil*, 2020 IL App (4th) 190250, ¶ 22. A ministerial act involves mere obedience to instructions or laws and requires no judgment or discretion whatsoever. *People ex rel. Aramburu v. City of Chicago*, 73 Ill. App. 2d 184, 195 (1966); see Black's Law Dictionary (11th ed. 2019). *Mandamus*, therefore, "will not be granted *** when the act in question involves the exercise of an official's discretion." *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 193 (2009).

¶ 22        When a public official "has considered and determined what his course of action is to be, he has exercised his discretion, and his action is not subject to review or control by *mandamus*." (Internal quotation marks omitted.) *International Harvester Co. v. Goldenhersh*, 86 Ill. 2d 366, 369 (1981). Likewise, "[w]hen a statute vests discretion in a municipal body to determine any matter or thing, it is not the province of courts to control the exercise of that discretion." *Coughlin v. Chicago Park District*, 364 Ill. 90, 110 (1936). In simplest terms, *mandamus* is not an error correction, nor is it a substitute for an appeal. *Chicago & North Western Transportation Co. v. Matoesian*, 85 Ill. 2d 404, 409 (1981). Accordingly, "*[m]andamus* cannot

be used to direct a public official or body to reach a particular decision or to exercise its discretion in a particular manner, even if the judgment or discretion has been erroneously exercised." (Internal quotation marks omitted.) *Mabwa v. Mendoza*, 2014 IL App (1st) 142771, ¶ 36. "For a complaint seeking *mandamus* relief to withstand a motion to dismiss, it must allege facts which establish a clear right to the relief requested, a clear duty of the respondent to act, and clear authority in the respondent to comply with the writ." (Internal quotation marks omitted.) *Cebertowicz*, 2016 IL App (4th) 140917, ¶ 15.

¶ 23                                          b. Declaratory Judgment

¶ 24          To survive a section 2-615 motion to dismiss, the complaint seeking declaratory judgment must "allege[ ] facts showing an actual or justiciable controversy between the parties and pray[ ] for a declaration of rights and other legal relations of the parties." (Internal quotation marks omitted.) *AG Farms, Inc. v. American Premier Underwriters, Inc.*, 296 Ill. App. 3d 684, 689 (1998). We have "previously identified the elements of an action for declaratory judgment: (1) a plaintiff with a tangible legal interest, (2) a defendant with an adverse interest, and (3) an actual controversy regarding that interest." *AG Farms*, 296 Ill. App. 3d at 689. We note "an actual controversy means a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof." (Internal quotation marks omitted.) *Weckbacher v. Watson*, 2025 IL App (4th) 250067, ¶ 36.

¶ 25                                          3. *Statutory Construction*

¶ 26          The parties agree section 5-12020 of the Counties Code governs this appeal. They disagree on what the section means or what it permits. Specifically, the parties dispute whether section 5-12020 allows the County to impose and apply subjective zoning standards or exercise

any discretion when deciding whether to approve applications for siting approval or special use permits. And so, to a small degree, this case presents us with the task of statutory construction: " '[t]he act or process of interpreting' or explaining the meaning of a statute." *Kloeppel v. Champaign County Board*, 2021 IL App (4th) 210091, ¶ 15 (quoting Black's Law Dictionary (11th ed. 2019)). A statute's meaning presents a purely legal question we review *de novo*, meaning our "review is independent and not deferential." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 27     "It is well established that [our] primary objective *** when construing the meaning of a statute is to ascertain and give effect to the legislature's intent." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). We look first to the statute's language because "the specific words the legislature chose to use are the best evidence of legislative intent." *Kloeppel*, 2021 IL App (4th) 210091, ¶ 15. We give the statute's words their plain, ordinary meanings, and if the "language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction." *Michigan Avenue National Bank*, 191 Ill. 2d at 504. "[W]e view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation." *Bowman v. Ottney*, 2015 IL 119000, ¶ 9. Our supreme court "has previously held that sections of the same statute should be considered so that each section can be construed with every other part or section of the statute to produce a harmonious whole." *Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 40. In discerning the legislature's intent for the statute's meaning and reach, "[w]e presume the legislature *** acted rationally and with full knowledge of other statutes and judicial decisions concerning existing law." *Village of Chatham v. County of Sangamon*, 351 Ill. App. 3d 889, 895 (2004).

¶ 28     It bears mentioning what we must avoid during statutory construction. "[C]ourts

cannot legislate, but must interpret the law as announced by the legislature." *Laborer's International Union of North America, Local 1280 v. Illinois State Labor Relations Board*, 154 Ill. App. 3d 1045, 1058 (1987). Accordingly, we "may not declare that the legislature did not mean what the plain language of the statute imports." (Internal quotation marks omitted.) *Kloeppel*, 2021 IL App (4th) 210091, ¶ 17. "Nor, under the guise of statutory interpretation, can we 'correct' an apparent legislative oversight by rewriting a statute in a manner inconsistent with its clear and unambiguous language." *People v. Pullen*, 192 Ill. 2d 36, 42 (2000).

¶ 29 With these principles in mind, we turn to section 5-12020 of the Counties Code.

¶ 30 B. The 2023 Statewide Siting Act

¶ 31 In the 2022 legislative session, the General Assembly significantly amended section 5-12020 of the Counties Code, culminating in the creation of the Act. Pub. Act 102-1123 (eff. Jan. 27, 2023). Like its predecessor, the Act's amendments to the Counties Code granted counties discretionary authority to "establish standards for commercial wind energy facilities, commercial solar energy facilities, or both." Pub. Act 102-1123, § 30 (eff. Jan. 27, 2023); see 55 ILCS 5/5-12020(b) (West 2024). Unlike its prior version, however, the Act limited counties' authority to disallow commercial wind or solar energy facilities in districts zoned to allow agricultural or industrial uses. Pub. Act 102-1123, § 30 (eff. Jan. 27, 2023); see 55 ILCS 5/5-12020(h) (West 2024). For the first time, the General Assembly dictated where these commercial energy facilities could be zoned, a decision previously left to the counties' discretion. The amendments made by the Act also updated terminology and codified certain requirements, like setback distances, public road rights-of-way, fencing and screening, height limits, and sound limits for commercial wind or solar energy facilities throughout Illinois. Pub. Act 102-1123, § 30 (eff. Jan. 27, 2023); see 55 ILCS 5/5-12020(e), (f), (m) (West 2024). The Act set the ceiling for those

requirements rather than leaving it to the discretion of counties' zoning regulations, meaning counties could not impose greater restrictions on them. Pub. Act 102-1123, § 30 (eff. Jan. 27, 2023); see 55 ILCS 5/5-12020(b) (West 2024). The Act provided that when a request for siting approval or special use permit complies with the statute, the local zoning ordinance, and other state and federal regulation, the request "shall be approved." Pub. Act 102-1123, § 30 (eff. Jan. 27, 2023); see 55 ILCS 5/5-12020(g) (West 2024).

¶ 32                              1. *Winnebago County's UDO*

¶ 33            Winnebago County amended the UDO in 2024 and included section 5-12020's requirements and standards in the newly revised article 17. In addition to section 5-12020's mandate that counties hold public hearings on applications (55 ILCS 5/5-12020(c) (West 2024)), section 17.3(A) of the UDO added:

> "The County values the import of the public's input in matters concerning land use and expressly recognizes that the citizenry of Winnebago County has maintained a long-standing cherished opportunity to be heard at zoning hearings. Accordingly, consonant with the spirit of the public hearing requirement set forth in 55 ILCS 5/5-12020(c), the County Board shall give due consideration to public testimony in making its siting decision. In doing so, the County Board may consider the factors set forth in Article 4, Section 4.3.4(4)(a-f), although no written findings of fact shall be required of the ZBA and/or County Board. Nothing shall prohibit the County Board from considering the transcribed record of the public hearing and the factors set forth in Article 4, Section 4.3.4(4)(a-f), in making

- 11 -

its final decision." Winnebago County Code of Ordinances § 90-17.3(A) (adopted July 25, 2024).

The factors outlined in section 4.3.4(4)(a)-(f) of the UDO are used to evaluate applications for special use permits and include:

"a. The establishment, maintenance or operation of the special use will not be detrimental to or endanger the public health, safety, morals, comfort or general welfare;

b. The special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood;

c. The establishment of the special use will not impede the normal or orderly development and improvement of the surrounding property for uses permitted in the district;

d. Adequate utilities, access roads, drainage and/or necessary facilities have been, are being or will be provided;

e. Adequate measures have been or will be taken to provide ingress or egress so designed as to minimize traffic congestion in the public streets; and

f. The special use shall, in all other respects, conform to the applicable regulations of the district in which it is located." Winnebago County Code of Ordinances § 90-4.3.4(4)(a)-(f) (adopted June 11, 2015).

These are the factors the ZBA referenced when it recommended denying plaintiffs' applications.

¶ 34 These five factors sit at the center of this appeal. The parties agree these are subjective factors and allow the County to exercise discretion when reviewing applications. They disagree on whether section 5-12020 permits their inclusion in a local ordinance. The County maintains section 5-12020 allows it to enact and consider these factors when considering applications for siting approval or special use permits. By contrast, plaintiffs argue subsections (b) and (g) of section 5-12020 of the Counties Code foreclose counties from including *any* subjective factors in zoning ordinances, let alone considering them when reviewing applications, because they are inherently more restrictive than the statute's requirements. See 55 ILCS 5/5-12020(b), (g) (West 2024). Because plaintiffs direct our attention to subsections (b) and (g) of section 5-12020, we start there.

¶ 35 2. *Section 5-12020 Gives Counties Discretion*

¶ 36 a. Section 5-12020(g)

¶ 37 Plaintiffs' complaints grounded their right to relief in section 5-12020(g). They contend subsection (g) gives them a clear right to approval of their applications. They give it a mandatory application and argue it requires the County to approve their applications. The relevant part of subsection (g) provides:

"A request for siting approval or a special use permit for a commercial wind energy facility or a commercial solar energy facility, or modification of an approved siting or special use permit, *shall be approved if* the request is in compliance with the standards and conditions imposed in this Act, the zoning ordinance adopted consistent with this Code, and the conditions imposed under State

- 13 -

and federal statutes and regulations." (Emphasis added.) 55 ILCS 5/5-12020(g) (West 2024).

Plaintiffs emphasize the statute's use of "shall," arguing it imposes a mandatory obligation and removes any discretion from the County's decision, thereby making *mandamus* and declaratory judgment proper. Although it is true the "[u]se of the word 'shall,' appearing in a statute, ordinarily imposes an imperative duty," that word does not "have an exclusive, fixed, or inviolate connotation." *Cole v. Department of Public Health*, 329 Ill. App. 3d 261, 264 (2002). "[A] statute's use of the term 'shall' is not dispositive." *Cebertowicz*, 2016 IL App (4th) 140917, ¶ 17. For example, "shall" can carry a mandatory, permissive, or directory meaning. See *Cebertowicz*, 2016 IL App (4th) 140917, ¶¶ 16-17; *Cole*, 329 Ill. App. 3d at 264-65. The word's meaning in any particular statute depends upon legislative intent, which courts infer from the context within which the word is used. *Cole*, 329 Ill. App. 3d at 264. We discern the meaning of the word "shall" by considering whether the statute confers a right or dictates a particular consequence for noncompliance. *Cole*, 329 Ill. App. 3d at 264-65; *Cebertowicz*, 2016 IL App (4th) 140917, ¶ 17. Neither party indulges in such an analysis. Plaintiffs assume "shall" in subsection (g) carries a mandatory meaning and dismiss any argument to the contrary, while the County makes no argument at all regarding the word's meaning. We do not hold "shall" carries a mandatory meaning, but even if we assume the General Assembly intended for "shall" to be mandatory, such a construction would not resolve this appeal.

¶ 38        In our view, plaintiffs' argument overlooks another important word in subsection (g)—"if." Assuming subsection (g) is mandatory, the mandate triggers only "if" the request complies with section 5-12020, the local zoning ordinance, and other state and federal statutes and regulations. See 55 ILCS 5/5-12020(g) (West 2024). Here, the County denied plaintiffs'

applications because they did not satisfy the local zoning ordinance, specifically section 17.3(A) of the UDO. Thus, the County is under no mandatory duty to approve noncompliant applications. But does section 5-12020 permit such an ordinance? May an ordinance contain subjective factors granting counties such discretion? To answer these questions, we turn to subsection (b).

¶ 39                                            b. Section 5-12020(b)

¶ 40            Section 5-12020(b) grants counties discretionary authority to establish standards for commercial solar energy facilities. See 55 ILCS 5/5-12020(b) (West 2024) ("Notwithstanding any other provision of law or whether the county has formed a zoning commission and adopted formal zoning under Section 5-12007, *a county may establish standards for commercial wind energy facilities, commercial solar energy facilities, or both*." (Emphasis added.)). This grant of authority is not without guidance: "The standards may include all of the requirements specified in this Section but may not include requirements *** that are *more restrictive than specified in this Section*." (Emphasis added.) 55 ILCS 5/5-12020(b) (West 2024). Plaintiffs seize on this language to argue the County's UDO imposes more restrictive standards by including special use factors. However, the General Assembly chose to use two different words in section 5-12020(b) for how counties can regulate commercial solar energy facilities—"standards" and "requirements." This is significant. Counties may establish standards, and those standards may or may not include the requirements specified in the statute. Thus, counties have some discretion in establishing standards, and, significantly, the statute's specified requirements are only part of those standards.

¶ 41            Both section 5-12020(b)'s sentence structure and specific wording indicate "standards" and "requirements" are neither coterminous nor synonymous. It is a well-settled principle in statutory construction that when the General Assembly uses different words within the same section of a statute, it intends different meanings for those words. *In re Marriage of Paris*,

2020 IL App (1st) 181116, ¶ 38; see *In re Westland*, 48 Ill. App. 3d 172, 176 (1976). We infer the General Assembly intended for "standards" and "requirements" to have different meanings. Consequently, by the statute's own terms, the standards a county may establish are not limited to the requirements listed in the statute. Operating from the basic premises that (1) the General Assembly knows how to draft legislation in accordance with its intentions and (2) we can look to other statutes to understand the legislative intent for specific words (see, *e.g.*, *In re Application of the County Treasurer & ex officio County Collector*, 2017 IL App (4th) 170003, ¶¶ 39-49), we observe that elsewhere in the Counties Code, the legislature grants counties authority to establish "standards" to regulate zoning, namely, special uses. See 55 ILCS 5/5-12009.5(c) (West 2024).

¶ 42    Plaintiffs' briefing often conflates "standards" and "requirements," maintaining counties cannot establish *standards* that are *more restrictive* than section 5-12020. It presumes the legislature intended one meaning while using two different words. During oral argument, plaintiffs' counsel maintained there was no "principal difference" between the words. But that is not what section 5-12020's plain language suggests. And we "may not declare that the legislature did not mean what the plain language of the statute imports." *Laborer's International*, 154 Ill. App. 3d at 1058. We cannot say the legislature intended for "standards" and "requirements" to share one meaning and be used interchangeably because the use of those specific words within the same statute militates against such an intent.

¶ 43    By subsection (b)'s plain language, requirements fall within standards, like subcategories of sorts. In various other subsections, section 5-12020 goes on to list what counties may or may not require within their standards governing commercial solar energy facilities. See 55 ILCS 5/5-12020(e), (i), (k)-(*l*), (n)-(r) (West 2024). In three subsections, the statute mandates what counties shall or shall not require within their standards. 55 ILCS 5/5-12020(j), (s), (s-5)

(West 2024). In all but one instance in the statute, the General Assembly used "standards" to refer to what the counties can establish to locally regulate commercial solar energy facilities. 55 ILCS 5/5-12020(b), (c), (g), (j) (West 2024). In subsection (g), it coupled "standards" with "conditions" to describe what the statute imposes. 55 ILCS 5/5-12020(g) (West 2024) (stating a request "shall be approved if the request is in compliance with the standards and conditions imposed in this Act"). We do not see any legislative intent to equate "standards" with "requirements" from this unique coupling of "standards and conditions." After all, both section 5-12020 of the Counties Code and the Counties Code in general give counties authority to establish "standards" for zoning. The plain language throughout the whole statute indicates the General Assembly intended "requirements" and "standards" to have different meanings. See *Paris*, 2020 IL App (1st) 181116, ¶ 38.

¶ 44        Looking to the sentence structure of subsection (b), the phrase, "more restrictive," modifies or relates back to "requirements," not "standards," and "more restrictive" cannot be disconnected from "than specified in this Section." 55 ILCS 5/5-12020(b) (West 2024). The requirements a county chooses to include in its standards cannot be more restrictive than those specified in section 5-12020. If the General Assembly intended "more restrictive" to modify "standards" and not "requirements," as the plaintiffs suggest, it must be the one to correct the mistake. We cannot correct any legislative oversight because section 5-12020's language as written is clear and unambiguous. See *Pullen*, 192 Ill. 2d at 42. Section 5-12020(b)'s plain language indicates the legislature intended to prohibit counties from establishing standards that included more restrictive requirements for setback distances, public road rights-of-way, fencing and screening, panel height limits, or any other requirements "*specified in this Section.*" (Emphasis added.) See 55 ILCS 5/5-12020(b) (West 2024). Whatever specific requirements from section 5-12020 a county chooses to include in its standards regulating commercial solar energy facilities,

those requirements cannot be more restrictive than what that section allows.

¶ 45     Therefore, nothing in section 5-12020(b)'s plain language prohibits counties from including subjective factors in their standards for commercial solar energy facilities. If anything, subsection (b) suggests "standards" encompass more than the "requirements" outlined in section 5-12020. We also observe subsection (b) contains no express language prohibiting counties from including in their standards any factors that are not specified in the section 5-12020. We note the General Assembly knows how to restrict a county's regulatory power or restrict what provisions must apply in county regulations or control what a county board may consider when granting approval for various projects. See 55 ILCS 5/5-12001.1 (West 2024). But more importantly, no other subsection in section 5-12020 prohibits counties from including in their standards factors or criteria not referenced in section 5-12020. In fact, other subsections indicate the General Assembly intended, and even expected, that counties would establish standards for commercial solar energy facilities that included subjective criteria.

¶ 46                                    c. Section 5-12020(c)

¶ 47     In section 5-12020(c), the General Assembly introduced the term "special use permit" into the Act, something missing from the prior statute. See Pub. Act 102-1123, § 30 (eff. Jan. 27, 2023); 55 ILCS 5/5-12020(c) (West 2024). We infer, however, that some counties previously regulated commercial solar energy facilities through special use permits under the prior statute. 55 ILCS 5/5-12020(u) (West 2024) (noting the amendments established in the Act do not apply to special use applications submitted before the Act's January 2023 effective date). Nevertheless, adding the specific term "special use permit" as an alternative or additional method of zoning regulation to the Act's plain language indicates the General Assembly intended counties to have some discretion over commercial solar energy facilities.

¶ 48          Special use permits are well known to Illinois law. See 55 ILCS 5/5-12009.5 (West 2024); *City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill. 2d 1 (2001). Generally, "a 'special use' is a type of property use that is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets certain criteria or conditions." *Living Word*, 196 Ill. 2d at 16. By now, it is elementary that local zoning authorities must consider some subjective factors before approving special uses. See *Living Word*, 196 Ill. 2d at 17 (stating special uses require "a local legislative determination that the use *** is neither inconsistent with the public's health, safety, morals or general welfare, nor out of harmony with the town's general zoning plan" (internal quotation marks omitted)). Special use permits are issued on a case-by-case basis. Indeed, "[t]he granting of a special-use permit is a discretionary function of a legislative body, which considers the circumstances of a particular case and independently determines whether the particular use in the proposed location is designed in such a way as to be compatible with the surrounding area." *Copley Memorial Hospital, Inc. v. City of Aurora*, 99 Ill. App. 3d 217, 221 (1981); see *La Salle National Bank v. County of Lake*, 27 Ill. App. 3d 10, 16-17 (1975) ("The granting of a special-use permit is not merely a ministerial function of a legislative body.").

¶ 49          A locality may issue a special use permit if it "meets the *standards* established for that classification in the ordinance." (Emphasis added.) 55 ILCS 5/5-12009.5(c) (West 2024). Evaluating those standards requires a public hearing. A locality cannot issue a special use permit without first holding a public hearing. See 55 ILCS 5/5-12009.5(b) (West 2024). Likewise, section 5-12020(c) mandates that counties that establish standards under subsection (b) hold at least one public hearing before granting siting approval or a special use permit. See 55 ILCS 5/5-12020(c) (West 2024). It sets out requirements for the hearing and allows for the presentation of evidence,

cross-examination of witnesses, and public comment. 55 ILCS 5/5-12020(c) (West 2024). It requires counties to make decisions on applications after the hearing. We find this significant because public hearings, and evidentiary hearings generally, require the decision-maker to exercise judgment or discretion regarding what to do with the information obtained. See *Public Hearing,* Black's Law Dictionary (11th ed. 2019). If counties had no discretion or exercised no judgment in approving applications, these public hearings would be pure spectacle.

¶ 50          We presume the General Assembly, when enacting a statute, "acted rationally and with full knowledge of other statutes and judicial decisions concerning existing law." *Village of Chatham*, 351 Ill. App. 3d at 895. In Illinois law, a "special use permit" necessarily involves subjectivity and discretion, as do public hearings. Counties regulate special uses by establishing standards that give them discretion to approve or deny permitting for such use. See 55 ILCS 5/5-12009.5 (West 2024). We presume the legislature knew all of this when drafting the Act. See *Village of Chatham*, 351 Ill. App. 3d at 895. By including the specific term "special use permit" in the Act's plain language and requiring public hearings, where evidence and public comment would be presented, the General Assembly evinced an intent that counties could, and would, consider subjective criteria when deciding whether to grant siting approval or a special use permit.

¶ 51                                    d. Construction

¶ 52          Considering section 5-12020 in its entirety, we observe the General Assembly intended to update how commercial solar energy facilities are zoned and regulated in Illinois. There is no question the Act removed some discretion counties previously had over zoning these facilities. For example, they can no longer prohibit commercial solar energy facilities in districts zoned industrial or agricultural (55 ILCS 5/5-12020(h) (West 2024)), and they cannot increase restrictions on some facility requirements, like setback distances, fencing, and solar panel height

(55 ILCS 5/5-12020(e) (West 2024)). But viewing section 5-12020 as a whole, we see the Generally Assembly did not intend to eliminate all discretion that counties exercise in regulating commercial solar energy facilities. Counties may establish standards regulating commercial solar energy facilities (55 ILCS 5/5-12020(b) (West 2024)), and those standards may include subjective factors since these facilities can be regulated with special uses permits (55 ILCS 5/5-12020(c), (g) (West 2024)). Counties must hold at least one public hearing where evidence is presented, witnesses can be cross-examined, and public comment is heard. 55 ILCS 5/5-12020(c) (West 2024).

¶ 53          In arguing the County had no discretion in this matter and was mandated to approve their applications for siting approval, plaintiffs ask us to isolate words and phrases and read them separately from section 5-12020 in its entirety. They emphasize "shall" in subsection (g) and "more restrictive" in subsection (b) to argue the statute prevents counties from establishing standards that include subjective factors that might give them any discretion when zoning commercial solar energy facilities. But section 5-12020's plain language, viewed as a whole, undercuts such a construction. With this understanding of the statute, we turn to plaintiff's claims for *mandamus* relief and declaratory judgment.

¶ 54                              C. *Mandamus*

¶ 55          Recall, to state a claim for *mandamus*, a plaintiff must allege facts establishing a clear right to the requested relief, a clear duty to act by the public official, and clear authority for the official to comply with the order. *Konetski*, 233 Ill. 2d at 193. *Mandamus* cannot be granted "when the act in question involves the exercise of an official's discretion." *Konetski*, 233 Ill. 2d. at 193. Also, the duty to act must be a *purely* ministerial task, involving no discretion at all. *Oliver*, 2020 IL App (4th) 190250, ¶ 22. Here, plaintiffs' complaints alleged "a clear legal right to the

approval of the Application pursuant to Section 5-12020(g) of the [Counties Code]," and so the "County had a clear, mandatory, and non-discretionary duty to approve the Application." Viewing these allegations in the light most favorable to plaintiffs, we hold they do not—and cannot—state a claim for *mandamus* for which relief can be granted. Despite plaintiffs' reliance on "shall" in subsection (g), section 5-12020 is littered with opportunities for counties to exercise discretion, as it outlines what counties may or may not do.

¶ 56        More importantly, however, section 5-12020 allows the County to exercise some discretion when reviewing applications for siting approval or special use permits. Accordingly, it does not confer plaintiffs a clear, legal right to permits. Here, the County exercised that discretion in denying the applications, which removes its decisions from *mandamus*. See *Goldenhersh*, 86 Ill. 2d at 369. *Mandamus* cannot be used for error correction. Even if the County exercised its discretion erroneously, *mandamus* cannot be invoked to correct the error. *Mabwa*, 2014 IL App (1st) 142771, ¶ 36. The extraordinary remedy of *mandamus* is not appropriate here. See *Coughlin*, 364 Ill. at 110. The trial court rightly dismissed plaintiffs' *mandamus* counts.

¶ 57        We note the Appellate Court, Third District, in *Equity Solar Illinois v. County of Grundy*, 2026 IL App (3d) 250289, ¶ 28, held that section 5-12020 afforded counties some discretion in regulating commercial solar energy facilities and reviewing applications for siting approval or special use. However, it found the extraordinary remedy of *mandamus* appropriate while never identifying it to be an extraordinary remedy at all. The court curiously found "no intent to eliminate discretion" in the plain language of the statute but concluded "discretion is minimized on the front end" of the regulatory process "and eliminated on the back end." (Emphasis omitted.) *Equity Solar*, 2026 IL App (3d) 250289, ¶ 23. Minimized discretion is still discretion. One cannot read the statute as having no intention to eliminate discretion, while at the same time finding

discretion both minimized and eliminated. We acknowledge *Equity Solar*'s facts differ from the facts before us; nevertheless, we cannot reach a similar holding here. We do not believe *Equity Solar*'s holding is viable under Illinois's *mandamus* jurisprudence and note it cites no Illinois case law to support its holding. It is blackletter law—*mandamus* is an extraordinary remedy available only when the mandated act is purely ministerial and involves no discretion whatsoever. *Oliver*, 2020 IL App (4th) 190250, ¶ 22.

¶ 58                                    D. Declaratory Judgment

¶ 59          A claim for declaratory judgment must allege the following elements: "(1) a plaintiff with a tangible legal interest, (2) a defendant with an adverse interest, and (3) an actual controversy regarding that interest." *AG Farms*, 296 Ill. App. 3d at 689. Plaintiffs' claims for declaratory judgment mirrored their *mandamus* counterparts, relying "on the same facts and theory." During oral argument, plaintiffs' counsel acknowledged the two counts were linked. The complaints seemingly alleged plaintiffs' tangible interest to be "a clear legal right to approval of the Application pursuant to Section 5-12020(g) of the [Counties Code]." Similarly, it appears the complaints alleged the County's adverse interest to be its refusal "to approve the Application."

¶ 60          Because section 5-12020 of the Counties Code affords counties some level of discretion in regulating commercial solar energy facilities, we cannot say these apparently divergent interests create an actual controversy that can yield an immediate and definitive determination of the parties' rights or obligations. See *Weckbacher*, 2025 IL App (4th) 250067, ¶ 36. Believing *mandamus* to be the better vehicle for asserting a "clear legal right to approval" and the mandatory duty for the County, plaintiffs sought an order from the trial court declaring their applications to be approved. Having concluded plaintiffs are not entitled to the extraordinary remedy of *mandamus*, there is no tangible interest or "clear legal right to approval," nor is there

- 23 -

an actual controversy as currently pled. Viewing the allegations in the light most favorable to plaintiffs, we hold plaintiffs did not state a claim on which relief can be granted. Based on a plain reading of section 5-12020 in its entirety, subsection (g) does not confer a clear legal right for plaintiffs devoid of the discretion which counties continue to enjoy. See 55 ILCS 5/5-12020(g) (West 2024).

¶ 61                                    E. Coda

¶ 62        Plaintiffs grounded their complaints in section 5-12020, and so we have confined our analysis to that section. Plaintiffs framed the issue as "whether, in the wake of the 2023 Statewide Siting Act, counties may impose and consider factors beyond those listed in the Statewide Siting Act in connection with siting applications for commercial solar (and wind) energy facilities." Nevertheless, much of the briefing and oral argument addressed the propriety of the County's UDO. The County's counsel admitted the UDO is not "a perfectly written ordinance." We agree. Notably, it blends permitted use and special use. While this is not expressly prohibited by the Counties Code, it does appear to be an anomaly. Plaintiffs, however, did not directly attack the UDO. They could have included in their complaints counts alleging the UDO itself was unlawful or the County abused its discretion in denying the applications, but they did not. Plaintiffs believed *mandamus* provided the best procedural vehicle to challenge the County's decision, so much so they infused their declaratory judgment count with *mandamus* principles. Invoking subsection (g) of section 5-12020 and its use of "shall be approved" (55 ILCS 5/5-12020(g) (West 2024)), plaintiffs chose to seek an extraordinary remedy rather than seek reversal through ordinary means. Just as we cannot rewrite statutes, we cannot rewrite complaints or reevaluate trial strategy. Our analysis has been confined to how the parties framed the case—section 5-12020, *mandamus*, declaratory judgment, and section 2-615 of the Code.

¶ 63                            III. CONCLUSION

¶ 64            For the reasons stated, we affirm the trial court's judgment.

¶ 65            Affirmed.

¶ 66            JUSTICE LANNERD, specially concurring:

¶ 67            While I concur in the result reached by the majority, I write separately because I do not join in the reasoning found in paragraphs 38 through 45 of the majority opinion. Further, in addition to the reasons given by the majority for determining *Equity Solar* was not correctly decided, it is important to note the Third District did not consider the public hearing requirement found in subsection (c) of section 5-12020 of the Counties Code (55 ILCS 5/5-12020(c) (West 2024)) when determining the General Assembly's legislative intent.

*Tate Road Solar 1, LLC v. County of Winnebago*, 2026 IL App (4th) 250873

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, Nos. 25-MR-30, 25-MR-57; the Hon. Richard A. Barch, Judge, presiding. |
| **Attorneys for Appellant:** | Timothy D. Elliott and Ronald D. Menna Jr., of Rathje Woodward, LLC, of Wheaton, and James R. Griffin and Nicholas D. Standiford, of Schain, Banks, Kenny & Schwartz Ltd., of Chicago, for appellants. |
| **Attorneys for Appellee:** | James A. Murphy, of Mahoney, Silverman & Cross, LLC, of Joliet, for appellee. |